UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                              )
UNITED STATES OF AMERICA,      )
                              )
        Plaintiff,             )
                              )
v.                            )          Civil No. 12-10179-LTS
                              )
TOWN OF LINCOLN ZONING         )
BOARD OF APPEALS, et al.,       )
                              )
        Defendants.           )
_____)


MEMORANDUM AND ORDER ON PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT

July 22, 2014

SOROKIN, D.J.

       Before the Court is Plaintiff's Motion for Summary Judgment.  Doc. No. 77.  This

litigation concerns a property dispute regarding certain tracts of land in the town of Lincoln,

Massachusetts.  Plaintiff, the United States, seeks declaratory and injunctive relief as to

Defendant's trespass on United States' property and compliance with National Park Service and

Air Force regulations.[1]  See generally Doc. No. 78.  Plaintiff claims that Defendant, the Town of

Lincoln Affordable Housing Trust (the Trust), has trespassed and intends to continue to trespass

on federal government property in order to access and improve their property, that any

construction on the Trust's property requires approval from the National Park Service, and that

access to and construction on an abutting property purported to be owned by the United States

requires approval pursuant to Air Force and National Park Service regulations.  Id.

_____
[1] Plaintiff's complaint also challenged the authority of the Town of Lincoln Zoning Board of Appeals to grant a
special permit to make improvements to the property in question.  Those claims were dismissed in this Court, Doc.
No. 45 at 11-12, and are currently before the Massachusetts Land Court, Doc. No. 78 at 3 n.2.

The United States has moved for summary judgment on the above described counts. Doc. No. 77. Defendant has opposed the Motion. Doc. No. 89. The parties have briefed the issues, and the Court held a hearing on this matter on June 24, 2014. After careful consideration, and for the reasons that follow, the United States' Motion for Summary Judgment is ALLOWED IN PART and DENIED IN PART.

I.     STATEMENT OF FACTS

The facts set forth below are undisputed, unless expressly noted otherwise, and all reasonable inferences from those facts are drawn in favor of Defendant, who opposes the Motion for Summary Judgment.

This litigation focuses on two abutting tracts of land, known for the purposes of this litigation as the Lot and the Parcel. The Lot, situated at 12 Airport Road, is currently owned by the Trust. Doc. Nos. 78 at 5 ¶ 14[2], 90 ¶ 14. The Parcel abuts the western boundary of the Lot and contains a segment of a paved road known as Airport Road.[3] See Doc. No. 100-1 at 2. For readers not familiar with the layout of these tracts, the map filed as Docket Number 81-3 in this action may be a helpful reference.

All of the land involved in this dispute is located in the town of Lincoln, Massachusetts, near its borders with the towns of Lexington and Bedford. See Doc. No. 81-4. In the years preceding 1946, the two tracts involved in this suit were included within one larger holding owned by the Estates of James M. Neville and Henry P. Neville. Doc. Nos. 78 at 5 ¶¶ 12-13, 90

---

[2] As the United States' statement of material facts is contained within its memorandum in support of the present Motion, which is not made up entirely of numbered paragraphs, see Doc. No. 78, for this document, the Court will use citations in the form of Doc. No. 78 at 5 ¶ 14 to indicate the page, in this example 5, on which the particular numbered paragraph, 14, may be located.

[3] The label "Parcel" can be confusing as the parties generally use "Parcel" to refer to the tract of land of less than two acres containing Airport Road that is labeled as Tract 01-180 on Doc. No. 81-3, and "Parcel A" to refer to the larger holding of approximately 12 acres containing Airport Road. For the sake of clarity, any reference to "the Parcel" in this memorandum will refer to the former, the smaller tract whose northwest extent abuts the Lot, unless expressly indicated otherwise.

¶¶ 12-13, 82-1 at 11.  In 1946, the Commonwealth of Massachusetts condemned part of the Neville holding, along with property held by several other landowners in the area, in order to construct a state highway to run northwest in Lincoln from the town line with Lexington to the town line with Bedford.  Doc. Nos. 90 ¶ 12, 82-1 at 11.  The length of the state highway as laid out in the Order of Taking was slightly more than 3,900 feet.  Doc. No. 82-1 at 2.  The state highway, known as Airport Road, was constructed so as to bisect the Neville holding, leaving the estate with property on either side of the land taken for the new state highway.  Doc. No. 82-1 at 11.  In 1952, Mary and Delia Neville conveyed a portion of the property on the western side of the highway, comprising approximately one acre, to William and Sarah Baltrush by deed.  Doc. Nos. 90 ¶ 13, 82-5 at 1.  This conveyance created the tract at 12 Airport Road known as the Lot, Doc. Nos. 78 at 5 ¶ 13, 90 ¶ 13, which abuts the land taken and laid out as a highway by the Commonwealth in 1946, Doc. Nos. 100-1 at 2, 105 ¶ 7.  The Baltrushes owned the Lot until 1973, Doc. No. 92-10 at 1, resided there, see Doc. No. 78-6 ¶ 3, and presumably accessed the property via the state highway throughout that time as no other road abuts the property.

In April of 1971, the Department of Public Works of the Commonwealth issued an Order of Alteration which purported to change the terminus of the state highway described above.  Doc. No. 92-5 at 1-2.  Per the document of alteration, the land subject to the 1946 condemnation that lay northwest of station 4+27.60[4] was deemed "no longer needed for State highway purposes."  Doc. No. 92-5 at 1.  Thus, the order "revis[ed] the line defining the northwesterly end of the State highway to conform to the southwesterly boundary of land no longer needed for State highway purposes," effectively shortening the highway by moving the terminus

_____

[4] The formulation "station 4+27.60" is meant to indicate a particular point on Airport Road as measured from a common starting point.  See Doc. No. 78-2 ¶ 11.  Specifically, "station 4+27.60" references a point on Airport Road that is 427.60 feet from a point along the border between Lexington and Lincoln that served as the common point of reference for the taking that occurred in 1946.  Id.

approximately 3,500 feet southwest.  Id.; Doc. No. 92 ¶ 17.  Put another way, the alteration

simply shortened the state highway from approximately 3,900 feet to 400 feet such that this short

state highway now ended in front of 8 Airport Road and did not reach 12 Airport Road.  The

Order of Alteration directed the Secretary of the Public Works Commission to send certified

copies of the revised plan and a certificate of alteration to both the Middlesex County

Commissioners and the Clerk of the Town of Lincoln.  Doc. No. 92-5 at 2.

While the Order of Alteration invokes Massachusetts General Laws Chapter 81, without

specifying a particular section, id. at 1; the parties appear to agree that the Commonwealth acted

only pursuant to Mass. Gen. Laws ch. 81, § 6.  The parties do dispute whether the

Commonwealth properly complied with the requirements for executing an alteration and the

significance of the alteration to the land at 12 Airport Road.  The United States contends that the

alteration terminated the public highway to the southwest of the Lot, leaving no portion of the

Lot abutting the state highway or, indeed, any public way, and thus stranding the tract without

any right of access after the alteration.  Doc. No. 78 at 15-17.  The Trust, for its part, asserts that

the alteration, if effective, transformed the state highway into a town road.  Doc. No. 111 at 6-7.

In any event, no evidence indicates or suggests that after the Order of Alteration, the

Commonwealth took any steps to prohibit access to the portion of the state highway abutting 12

Airport Road.[5]

In May of 1971, approximately one month after the Order of Alteration, the Department

of Public Works, on behalf of the Commonwealth and pursuant to the authority granted to it by

Mass. Gen. Laws ch. 81, § 7E, signed a deed that purported to convey to the United States the

portion of the state highway that, per the Order of Alteration, was no more.  Doc. No. 82-4 at 1-

---

[5] The Court does note the placement of a gate and guardhouse by the United States for a period of time on the
portion of the road purported to be altered, which is addressed below.  See Doc. No. 78-6 ¶¶ 9-11.

2.  Specifically, the instrument conveyed twelve acres of land, consisting of the property taken in 1946 northwest of station 4+27.60, which had been deemed no longer needed for state highway purposes in the Order of Alteration.  Id.  The conveyance granted the property in fee simple and contained no reservations or limitations.  Id.  The United States alleges that, since the conveyance, the Parcel has been owned by the United States and under the control of the United States Air Force.  Doc. Nos. 78 at 15, 78-5 ¶ 7.

Today, and for many years preceding the institution of this litigation, both Minute Man National Historical Park and Hanscom Air Force Base have existed in the vicinity of the Lot and the Parcel.  Doc. Nos. 78-1 ¶¶ 2, 6, 78-5 ¶ 7.  Lands comprising Hanscom Air Force Base lie to the north and the west of the Lot, Doc. No. 100-1 at 2, and, as mentioned, the United States alleges that the Parcel, to the east of the Lot, was incorporated into Hanscom at the time of the May 1971 conveyance to the United States.  Doc. No. 78-5 ¶ 7.  Additionally, Minute Man National Historical Park, as created in 1959, existed to the south of the Lot and the Parcel.  See Doc. No. 78-1 ¶¶ 2, 6.  In 1991, however, Congress expanded the legislative boundaries of the Park to include both the Lot and the Parcel.  Doc. No. 78-1 ¶ 6.

For some substantial period of time, Airport Road "had a lot of motor vehicle traffic" because it was the main and most convenient entrance to Hanscom Air Force Base.  Doc. No. 78-6 ¶ 8.  Later, the Base constructed another entrance, and now there is virtually no motor vehicle traffic on Airport Road, Doc. No. 78-6 ¶ 8, and the gate to the Base on Airport Road is generally closed, Doc. No. 78-1 ¶ 7.

In the period of 1971 to 1973, the gate to Hanscom Air Force Base existed on Airport Road to the southwest of the Lot.  Doc. No. 78-6 ¶ 9.  From the Lot, William Baltrush, the then owner of the Lot and an employee at the Base, could leave the Lot, access the old state highway,

and enter the Base without passing through the gate.  Doc. No. 78-6 ¶ 10.  The residents of 8

Airport Road, however, in order to enter their driveway from the portion of Airport Road which

is undisputedly public, had to pass through the gate.  Doc. No. 78-6 ¶ 10.  The evidence suggests

that the residents of both these properties enjoyed unfettered access to their properties via Airport

Road subject to the inconvenience of having to pass through the gate.  See Doc. No. 78-6 ¶¶ 9-

11.

In 1973, in response to complaints from the owner of 8 Airport Road, the Air Force

moved its gate further up Airport Road.  Doc. No. 78-6 ¶ 11.  Thereafter, one could come or go

from either 8 or 12 Airport Road without passing through the Base gate and without any

restriction or limitation.  See Doc. No. 78-6 ¶ 11.  After the Baltrushes sold the Lot in 1973, the

property was passed through a number of intervening conveyances before the Trust gained

ownership in 2011.  Doc. No. 92-10 at 1.  The house that existed on the Lot was damaged by fire

in 2005, and the property has been vacant since that time.  Doc. Nos. 78-6 ¶ 6, 90 ¶ 2.

The record evidence suggests that the Lot remained generally owned and occupied as a

single family residence until possibly as late as 2005 when the home burned.  See Doc. Nos. 78-6

¶ 7, 92-10 at 1.  Nothing in the record suggests any actual restriction on access to the Lot during

this period of time.  Subsequent to the fire, the Lot has remained unoccupied and unused, Doc.

No. 78-6 ¶ 6, although, again, there is no evidence of restrictions on access to the property until

December 2011, as described below.

After the expansion of the National Park in 1991, the United States, in 1998, acquired 8

Airport Road, which abuts the Lot to the south, from Josephine Stout, who retained a life estate

in the property.  Doc. Nos. 78 at 5 ¶ 15, 90 ¶ 15, 100-1 at 2.  The result of this acquisition was

that the Lot was now enclosed on all four sides by land either owned by or purported to be

owned by the United States: to the north and the west by lands comprising Hanscom Air Force Base, by 8 Airport Road to the south, and by the Parcel to the east.  Doc. No. 100-1 at 2.

The Trust acquired the Lot in 2011, Doc. No. 92-10 at 1, and intends to build a new residential housing structure on the tract.  Doc. Nos. 78 at 6 ¶ 19, 90 ¶ 19.  In December of 2011, the Trust moved construction equipment across the portion of Airport Road contained within the Parcel and onto the Lot.  Doc. Nos. 78 at 7 ¶ 23, 90 ¶ 23.  In January of 2012, Defendant Town of Lincoln Board of Zoning Appeals approved a special permit to construct a five-bedroom adult group home on the Lot.  Doc. Nos. 1-3, 78 at 6 ¶ 19, 90 ¶ 19.  To access the structure, Defendant intends to construct a driveway on the Lot that would continue over ninety feet of the Parcel to connect to Airport Road.  Doc. Nos. 78 at 6-7 ¶¶ 20-21, 90 ¶¶ 20-21.  From there, Defendant intends to use the portion of Airport Road contained within the Parcel to access the point on Airport Road beyond which it is uncontested that it is a public way.  Doc. Nos. 78 at 6-7 ¶¶ 20-21, 90 ¶¶ 20-21.

After Defendant moved construction equipment onto the Lot, in December of 2011, the Air Force placed barriers along the western portion of the Parcel, barring any further entry onto the Lot.  Doc. No. 78-5 ¶¶ 10-11.  In so doing, the United States physically barred access to the Lot from Airport Road but does not appear to have physically barred access to Airport Road itself.  Id.; Doc. No. 84-8.  This is the first instance of actual limitations on use of Airport Road to access the Lot that appears in the record.  The record does establish, however, that after the Trust purchased the Lot, the National Park Service and Department of the Interior advised the Town and the Trust that, in the government's view, no right of legal access to 12 Airport Road existed.  Doc. No. 78-1 ¶ 11.

Defendant has not sought the permission of either the National Park Service or the Air Force for construction on the Lot or for entry onto or construction on the Parcel.[6]

## II.    STATUTORY FRAMEWORK

The predecessors to the statutory framework that today exists in Mass. Gen. Laws Chapter 81, which governs state highways, can be traced back to, at least, 1893.  See Act of June 10, 1893, ch. 476, 1893 Mass. Acts 1412.  In 1900, the Massachusetts Legislature enacted the predecessor to the current alteration statute, which authorized the Department of Public Works[7] to "alter any location made by it for a state highway in any city or town."  Act of July 17, 1900, ch. 475, § 1, 1900 Mass. Acts 474, 474-75.  Alteration under the act required the concurrence of town officials and was effectuated by filing with the county commissioners a plan and a certificate that the Department had taken charge of the highway as altered.  Id.  The Department was also required to file a plan or location as altered with the affected town.  Id.

In the same act of 1900, the Legislature granted the Department the authority to "abandon any portion of the land or rights in land in any city or town taken or acquired by it."  Act of July 17, 1900, ch. 475, § 2, 1900 Mass. Acts 474, 475.  Abandonment required the concurrence of local officials; that a deed be executed, acknowledged, and recorded for the relevant interests; and also that a plan of survey be recorded with the deed.  Id.  The effect of abandonment was to

---

[6] After moving the construction equipment over the Parcel and onto the Lot, Defendant did, via email, ask for and receive permission from the Air Force to access the Lot through the Parcel for a period of seven days for the limited purpose of conducting soil percolation tests.  Doc. No. 78-5 ¶ 10.  No other permission has been requested or received.  Doc. Nos. 78-1 ¶ 13, 78-5 ¶ 14.

[7] Beginning in 2009, state highways were entrusted to the jurisdiction of the Division of Highways within the Massachusetts Department of Transportation.  Act of June 26, 2009, ch. 25, § 8, 2009 Mass. Acts 103, 103. Previously, state highways were under the control of the Massachusetts Highway Department and, before that, the Massachusetts Department of Public Works and, even earlier, the Massachusetts Highway Commission.  Act of Jan. 9, 1992, ch. 552, § 7, 1991 Mass. Acts 1330, 1331-32; Act of July 23, 1919, ch. 350, § 111, 1919 Mass. Acts 384, 427.  This series of changes in nomenclature explains the different titles used in various legislative enactments.  For ease of reference in this memorandum, references to the Department or the Department of Public Works—the title of the agency during much of the time period relevant to this case—will serve to reference that agency and its predecessor and successor entities as appropriate.

"revest the title [to the interest] as if never taken, in the persons, their heirs and assigns, in whom it was vested at the time of the taking." Id.

In 1921, in addition to the power to alter and abandon, the Legislature granted the Department the power to "discontinue as a state highway any way or section of way laid out and constructed." Act of May 24, 1921, ch. 427, § 2, 1921 Mass. Acts 517, 518-19. Discontinuance has the effect of converting the state highway to a town way. Id. In order to discontinue a state highway, the Department was required to obtain the concurrence of the county commissioners and file a certified copy of a plan showing the discontinued way and a certificate that the way had been discontinued with the county commissions and the clerk of the affected town. Id.

At the same time as adding the power to discontinue, the Legislature modified the Department's previously existing grants of authority. The Legislature removed the requirement to obtain the concurrence of the county commissioners when the Department abandoned land.[8] Id. The same enactment also set forth a presumption that a state highway would remain a state highway until it was otherwise acted upon, stating that a highway, laid out and taken charge of by the Commonwealth, "thereafter . . . shall be a state highway . . . but any state highway so laid out and constructed may be abandoned or discontinued." Act of May 24, 1921, ch. 427, § 1,

---

[8] The statute governing abandonment and discontinuance is today codified at Mass. Gen. Laws ch. 81, § 12, which has not been substantively amended since 1921. Section 12 reads as follows:

> The department, with the concurrence of the county commissioners, may discontinue as a state highway any way or section of way laid out and constructed under the provisions of section five by filing in the office of the county commissioners for the county and in the office of the clerk of the town in which such way is situated a certified copy of a plan showing the way so discontinued and a certificate that it has discontinued such way; and thereafter the way or section of way so discontinued shall be a town way. Said department may also abandon any land or rights in land which may have been taken or acquired by it by filing in the office of the county commissioners for the county and in the office of the clerk of the town in which such land is situated a certified copy of a plan showing the land so abandoned and a certificate that it has abandoned such land, and by filing for record in the registry of deeds for the county or district in which the land lies a description and plan of the land so abandoned; and said abandonment shall revest the title to the land or rights abandoned in the persons in whom it was vested at the time of the taking, or their heirs and assigns.

Mass. Gen. Laws ch. 81, § 12.

1921 Mass. Acts 517, 517-18.  A later enactment that same year removed from the alteration procedure the requirement to obtain the concurrence of town officials.[9]  Act of May 25, 1921, ch. 446, 1921 Mass. Acts 539.

In 1949, the legislature granted authority to the Department to "sell at public or private sale any portion of the lands or rights in land the title to which has been taken or received or acquired and paid for by it."  Act of Aug. 27, 1949, ch. 764, 1949 Mass. Acts 668.  The act gave the Department of Public Works the ability to sell interests in land that the Department determines are no longer necessary for state highway purposes and sets forth the procedures to effectuate such a sale.  Id.  Although early versions of the statute required the approval of the governor and council to execute a deed for the relevant interest, id., that requirement was eliminated when the statute was amended in 1965, allowing the Department to sell land pursuant to the statute without the involvement of other governmental entities, Act of Nov. 9, 1965, ch. 755, 1965 Mass. Acts 533.[10]

---

[9] Apart from removing the concurrence requirement, the alteration procedure otherwise remained intact and has not been substantively amended since that time.  The statute, in its entirety, reads as follows:

> The department may alter the location of a state highway in a city or town by filing a plan thereof and a certificate that the department has laid out and taken charge of said state highway, as altered in accordance with said plan, in the office of the county commissioners for the county where said highway is situated, and by filing a copy of the plan or location as altered in the office of the clerk of such city or town.

Mass. Gen. Laws ch. 81, § 6.

[10] Beyond sale of land or rights in land, section 7E also provides for the transfer and lease of such interests held by the Department in distinct ways that are not relevant to this litigation.  The first paragraph of the section, which governs the sale of interests and was cited as authority by the Department for its actions in this case, has not been amended since 1965 and reads as follows:

> The department may sell at public or private sale any land, or rights in land, the title to which has been acquired by the department for highway purposes, upon determination by the board of commissioners of said department that such land or rights in land are no longer necessary for state highway purposes. In the event of such public or private sale the department shall execute a deed thereof, with or without covenants of title and warranty, in the name and behalf of the commonwealth, to the purchaser, his heirs and assigns, and deposit said deed with the state treasurer, together with a certificate of the terms of the sale and the price paid or agreed to be paid at said sale. Upon receipt of said price, and upon the terms agreed to in said deed, the treasurer shall deliver the deed to said purchaser. The state treasurer may, by the attorney general, sue for and collect the price and otherwise enforce the terms of any such sale.

None of the statutes discussed above were substantively amended in ways relevant to this litigation from 1965 up through the Commonwealth's actions in 1971, nor have they been amended since 1971 through to the present.

III.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once a party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); accord Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995).  The Court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the Court must ignore "conclusory allegations, improbable inferences, and unsupported speculation." Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

"[T]here [must be] sufficient evidence favoring the nonmoving party for a [factfinder] to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249-50 (internal citations omitted).  "Trialworthiness requires not only a 'genuine' issue but also an issue that involves a 'material' fact."  Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995) (quoting Liberty Lobby, 477 U.S. at 248).  A material fact is one which has the "potential to affect the outcome of the suit under applicable law."  Nereida-Gonzalez v. Tirado-

Mass. Gen. Laws ch. 81, § 7E.

Delgado, 990 F.2d 701, 703 (1st Cir. 1993).  For a factual dispute to be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." Nat'l Amusements, 43 F.3d at 735 (internal citation omitted).

IV.     DISCUSSION

A.     Trespass

"To establish trespass, a plaintiff must prove 'actual possession of the plaintiff, and an illegal entry by the defendant.'"  Walker v. Jackson, 952 F. Supp. 2d 343, 353 (D. Mass. 2013) (quoting New Eng. Box Co. v. C & R Constr. Co., 49 N.E.2d 121, 128 (Mass. 1943)).  There is no dispute that the Trust has entered and, if lawful, intends to continue to enter the Parcel to access the Lot.  The parties dispute whether the United States possesses complete and exclusive control over the portion of Airport Road abutting the Lot.

The United States makes a fairly straightforward argument.  It contends that the portion of Airport Road northwest of station 4+27.60 was terminated as a public way in 1971 when the Commonwealth issued its Order of Alteration pursuant to Mass. Gen. Laws ch. 81, § 6.  The Order of Alteration included a determination that the road was no longer needed for state highway purposes, the only prerequisite to the sale of the land by the Department of Public Works pursuant to Mass. Gen. Laws ch. 81, § 7E, and the Commonwealth indeed did sell the land consistent with that authority in May of 1971.  The result of these two actions, it is argued, was the termination of any public right of access to the land and the conveyance of that land to the United States in fee simple.  From this, the United States contends that it owns the land unburdened by any easement held by the public and, as any other landowner, it holds the right to exclude and to prosecute trespass actions when that right is violated.

On the United States' theory, the Commonwealth virtually eliminated the state highway created by the 1946 taking by altering 3,500 feet of the 3,900-foot highway out of existence. The plain meaning of "alteration," combined with its construction in light of other provisions of Chapter 81, see, e.g., Mass. Gen. Laws ch. 81, § 12 ("The department . . . may discontinue as a state highway any way or section of way"); persuasive interpretative authority on point, see 8 Op. Mass. Att'y Gen. 249, 250 (Feb. 25, 1927) (expressing doubt over whether a change to the line of a highway "to a rather great extent" is a proper exercise of the alteration power); and the interpretation of the word in similar contexts, see Recore v. Town of Conway, 794 N.E.2d 593, 597 (Mass. App. Ct. 2003) (analyzing "alteration" in the context of county highways and holding that improvements to a road between given termini constituted an alteration of the way); suggest that section 6 might not reach that far. Upon close examination, however, this case does not require resolution of that question. The Legislature, in an act passed in 1958, authorized the closing of virtually all of Airport Road, except the Parcel, and the sale of that land to the United States. Act of Aug. 11, 1958, ch. 512, 1958 Mass. Acts 339.[11] Thus, when the Department of Public Works acted in 1971 to "alter" the state highway, as to the vast majority of the road, it acted pursuant to Chapter 512. See Doc. No. 92-7 at 1. Thus, closing the relatively small portion of Airport Road abutting the Lot pursuant to section 6 does not raise, in this case, any questions regarding the possible limits of the alteration authority granted by section 6.

---

[11] Defendant has questioned whether the Commonwealth complied with all of the requirements of Chapter 512. Defendant conceded at the hearing, however, that the Act does not concern the portion of Airport Road that abuts the Lot. Thus, any such disputes about compliance with the Act are not at issue in this dispute. This concession aside, Defendant's substantive contention on this point appears to be dubious. Defendant argues that the Commonwealth had to either abandon or discontinue the highway in order for "all right [sic] title and interest" to be acquired by the United States. Doc. No. 89 at 4 (quoting Act of Aug. 11, 1958, ch. 512, 1958 Mass. Acts 339). Yet, the plain language used in the statute, that the road be "abandoned, closed or otherwise discontinued" before exclusive jurisdiction vested, appears to contemplate that actions other than abandonment or discontinuance would suffice. See Act of Aug. 11, 1958, ch. 512, 1958 Mass. Acts 339.

Defendant advances one procedural and one substantive argument in response to the United States. First, Defendant contends that, after the "alteration" of the state highway, the portion of the road no longer included in the state highway, by operation of the common law of Massachusetts, became a town way. For support, they cite <u>Commonwealth v. Inhabitants of Westborough</u>, 3 Mass. 406, 407 (1807); <u>Carmel v. Baillargeon</u>, 487 N.E.2d 867, 869 n.8 (Mass. App. Ct. 1986). These cases did hold that the alteration of a county or town road, by law, results in a discontinuance of the portion of road not included in the new way. Defendant extrapolates from this that such a discontinuance results in the old road becoming a town way because that is the manner in which a statutory discontinuance operates under Chapter 81. The Court is not persuaded. The land underlying the portion of a state highway "altered" pursuant to section 6 that is not included in the new way can be disposed of by the Department of Public Works pursuant to section 7E (as occurred here), designated as a new state highway pursuant to section 5, or converted to a town way or returned to the original holders of the land pursuant to section 12. Given the range of procedures established by the Legislature, including one which specifically provides for conversion to a local way, Defendant's theory—that the omission from section 6 of specific directions for the disposition of the old portion of the altered highway means that the common law rule governing town or county ways of discontinuance applies—misses the mark. [12]

Defendant also challenges the alteration on procedural grounds. They allege that the procedural steps to alter the road as a state highway were not perfected, and, thus, Airport Road remains a state highway. Accordingly, to the extent that the United States holds title to the Parcel, they argue, that title is subject to a public easement. To alter a highway pursuant to

---

[12]  Notably, nothing, other than section 12 of Chapter 81, establishes that "discontinuance" means conversion into a town way. The cases Defendants cite do not state that roads discontinued as a matter of law became town or even private ways.

section 6, the Department of Public Works is required to file with the county commissioners a plan of alteration and a certificate that the Department has laid out and taken charge of the highway as altered. Mass. Gen. Laws ch. 81, § 6. The Department must also file a copy of the plan or location in the office of the clerk of the relevant town. Id.

In this case, the parties do not dispute that the plan and certificate were sent to the Middlesex County Commissioners. There is evidence supporting this conclusion in the form of a letter addressed to the clerk of the Commissioners which states that the required filings were enclosed with the letter, Doc. No. 83-7 at 1, and a general docket entry in the records of the County Commissioners, noting the alteration by the Department, Doc. No. 83-8 at 1. There is no evidence before the Court that the required filings with the County were not made.

Section 6 also requires the filing of a copy of the plan with the town clerk. After inquiry with the Lincoln Town Clerk's Office, the Clerk reports that she is not currently in possession of a plan filed as part of the 1971 alteration. Doc. No. 92 ¶ 28. There is no ledger entry or retained copy of a transmittal letter in the Commonwealth's possession showing the mailing of a plan to the Town Clerk in the record before the Court. The United States, in response, offers the affidavit of Christopher Quinn, an attorney for the Right of Way Bureau of the Massachusetts Department of Transportation, who states that the Department of Public Works made hundreds of these transactions during his tenure, that its regular procedure was to make all of the required filings, and that he has no knowledge of an instance where the requisite filings were not made. Doc. No. 105 ¶ 9. Quinn, however, did not come to work at the Highway Department until 1982, eleven years after the alteration. See id. ¶ 1. His affidavit contains no description of the general procedures governing the filing of alteration documents during the relevant time period. While he opines that he "believes" the filing was made and asserts he is unaware of any instance

in which required alteration filings were not made, id. ¶ 9, he cannot testify to what did or did not happen years before his arrival at the Department.

The United States also invokes the presumption of regularity that attaches to the affairs of government agencies. "It is to be presumed that public officers will discharge their duties honestly and in accordance with the rules of law. Every presumption is in favor of legality and good faith until the contrary is shown." Mello Const., Inc. v. Div. of Capital Asset Mgmt., 999 N.E.2d 1091, 1097 (Mass. App. Ct. 2013) (quoting Gen. Outdoor Adver. Co. v. Dep't of Pub. Works, 193 N.E. 799, 819 (Mass. 1935)); see also Tota v. Gonzáles, 457 F.3d 161, 168 (1st Cir. 2006) (quoting United States v. Armstrong, 517 U.S. 456, 464 (1996)).

Several undisputed facts support the application of the presumption. The Order of Alteration directed the Secretary of the Public Works Commission to take the purely ministerial step of filing copies of the paperwork regarding the alteration with both the County and the Town. Doc. No. 92-5 at 2. Specific evidence establishes the mailing of the documents to the County. Doc. Nos. 83-7, 83-8. In these circumstances, and in the absence of any other evidence, the presumption of regularity applies. See Kerr v. McDonald's Corp., 427 F.3d 947, 952 (11th Cir. 2005) (per curiam) (ruling that evidence regarding specific office procedures can suffice to invoke presumption); Miley v. Principi, 366 F.3d 1343, 1347 (Fed. Cir. 2004) (ruling that presumption applies to purely ministerial actions based in part on fact that notice was designated to be mailed with other documents that were in fact mailed). Thus, Defendant's objection that the statutory procedures were not followed is unavailing.

Defendant also cites certain common law easement doctrines that, they argue, could supply access to the Lot.[13] Specifically, Defendant points to the doctrines of easement by

---

[13] Defendant also raised the applicability of the Derelict Fee Statute, Mass. Gen. Laws ch. 183, § 58, to the tracts. At this point, the parties are in agreement that that statute does not apply to the properties in question.

necessity and easement by estoppel.  Neither of those doctrines apply to the Parcel given the circumstances in this case.  For an easement implied by necessity, the two relevant tracts must have been in common ownership at one time and the necessity must arise at the time of the severance of those tracts.  Kitras v. Town of Aquinnah, 833 N.E.2d 157, 163 (Mass. App. Ct. 2005).  Here, when the Lot was created and conveyed to the Baltrushes in 1952, there was no necessity because Airport Road existed as a state highway to provide access to the tract.

Similarly, to obtain an easement by estoppel, a grantor must convey land bounded by a way, and that grantor or her successors in title must later deny the existence of that way.[14]  Blue View Const., Inc. v. Town of Franklin, 874 N.E.2d 425, 432 (Mass. App. Ct. 2007).  In this case, the impediment to accessing the Lot was not the denial of the existence of the road by the grantors or their successors in title, but rather the independent action of the Commonwealth to terminate public access to what theretofore had been a public way.  Thus, the traditional doctrine does not apply, and Massachusetts courts have not embraced an expansion of that doctrine based on general principles of estoppel to reach beyond those limited circumstances.  Id. at 432-33.

Accordingly, the United States holds the Parcel in fee simple, unburdened by any easements or other rights of access arising prior to or from the 1971 alteration and conveyance. The record before the Court, however, also suggests that, from the time the United States took possession of the land in May 1971 until the United States placed barriers on the western side of Airport Road to bar access to the Lot in December 2011, the owners of 12 Airport Road, their invitees, and members of the public enjoyed unfettered access to that portion of Airport Road which constitutes the Parcel.  The record reveals only two qualifications to the foregoing.  From 1971 to 1973, users of the Parcel had to pass through the entry gate to the Base (though nothing

---

[14] Massachusetts has recognized a related doctrine "whe[re] a grantor conveys land situated on a street in accordance with a recorded plan that shows the street," Blue View Const., 874 N.E.2d at 432, which does not have application to this case.

indicates the Air Force imposed limits on access) and, after the purchase of 12 Airport Road by the Trust, representatives of the National Park Service and the Department of the Interior asserted that no right of legal access existed to 12 Airport Road.  The United States has not contended that it undertook other efforts to prevent access to the Lot.

Accordingly, the Motion for Summary Judgment is ALLOWED IN PART as to the issues resolved herein.  Prior, however, to entry of a final judgment that the United States, as an ordinary landowner, may enforce its right to prosecute trespassers on the Parcel, see United States v. Grabler, 907 F. Supp. 499, 502 (D. Mass. 1995) (quoting Camfield v. United States, 167 U.S. 518, 524 (1897)), the parties shall file a joint status report, within ten days of this Order, describing their shared or separate positions as to whether any further briefing or other proceeding is appropriate regarding the legal significance, if any, of the access to the Lot via the Parcel after the 1971 conveyance.

B.     Air Force Regulations

The United States next moves for summary judgment on their claim requesting declaratory and injunctive relief for Defendant's noncompliance with Air Force regulations for use of and construction on the Parcel.

The undisputed evidence in the case establishes that the United States holds title to the Parcel, see section IV.A supra; that Parcel is within the boundaries of Hanscom Air Force Base, which is under the jurisdiction of the United States Air Force, Doc. No. 78-5 ¶ 7; that Defendant intends to build a driveway that extends across the undeveloped land of the Parcel to connect to the paved portion of Airport Road contained within the Parcel, Doc. No. 90 ¶ 21; and that Defendant has not sought or received permission to engage in such construction; Doc. Nos. 78-1 ¶ 13, 78-5 ¶14.  These facts are sufficient to conclude that the regulations apply to construction

on the Parcel and that Defendant must obtain permission pursuant to any applicable regulations before engaging in construction on the Parcel. Accordingly, the United States' Motion for Summary Judgment on this count is ALLOWED.

        C.     <u>National Park Service Regulations</u>

The United States also moves for summary judgment on their count requesting declaratory and injunctive relief for Defendant's noncompliance with National Park Service regulations as they would apply to construction on the Lot and the Parcel.[15] The United States argues that, when Congress expanded the boundaries of Minute Man National Historical Park in 1991, the Lot and the Parcel were brought within the Park's boundaries and, this being so, both tracts are subject to National Park Service regulations. Specifically, the United States cites to 36 C.F.R. § 5.7, which states that construction in "any park areas, except in accordance with the provisions of a valid permit, contract, or other written agreement with the United States, is prohibited." 36 C.F.R. § 5.7.[16] A definition section states that "Park area[] means any area of land and water now or hereafter administered by the Secretary of the Interior through the National Park Service for park, monument, historic, parkway, recreational, or other purposes." 36 C.F.R. § 1.4. The United States makes the argument that the construction contemplated by the approved permit easily falls within the purview of the statute and that "park area" is defined broadly as to implicate privately owned land that is within the legislative boundaries of a

---

[15] The Parcel is both within the boundaries of Hanscom Air Force Base and the legislative boundaries of Minute Man National Historical Park. <u>See</u> Doc. Nos. 78-2 ¶ 3, 78-5 ¶ 7.

[16] The regulation, in full, reads:

      Constructing or attempting to construct a building, or other structure, boat dock, road, trail, path, or other way, telephone line, telegraph line, power line, or any other private or public utility, upon [sic] across, over, through, or under any park areas, except in accordance with the provisions of a valid permit, contract, or other written agreement with the United States, is prohibited.

36 C.F.R. § 5.7.

national park. Thus, the United States contends that both tracts are subject to the regulation and asserts that the United States has not granted a permit for any construction.

As to the Lot, Defendant argues that the regulation does not apply to the Lot as privately owned land and that the cases cited by the United States are all inapposite as to privately owned land that exists within the legislative boundaries of a national park. Defendant's objection is well taken for two reasons. First, the United States cites a series of cases that it asserts stand for the general proposition that "[t]he park has the authority to enforce its permit regulation" on privately owned land within the legislative boundaries of the park. Doc. No. 98 at 18. The cases do not stand for that proposition. Each cited case either (a) involves the application of regulations to land for which the United States is the fee owner of the land; United States v. Bohn, 622 F.3d 1129, 1132 & n.1 (9th Cir. 2010); United States v. Garfield Cnty., 122 F. Supp. 2d 1201, 1204 (D. Utah 2000); (b) involves a statute or regulation that states expressly that it applies "within the limits" of the park, United States v. Stephenson, 29 F.3d 162, 163-64 (4th Cir. 1994), or (c) stands for the abstract proposition that legislation passed pursuant to the Property Clause of the Constitution can reach beyond federally owned property as a matter of the limits of congressional action, Kleppe v. New Mexico, 426 U.S. 529, 546-47 (1976); United States v. Alford, 274 U.S. 264, 267 (1927); United States v. Brown, 552 F.2d 817, 822-23 (8th Cir. 1977).

Second, 36 C.F.R. § 1.2, provides that "[t]he regulations contained in parts 1 through 5 . . . of this chapter do not apply on non-federally owned lands and waters . . . located within National Park System boundaries, except as provided in paragraph (a) or in regulations specifically written to be applicable on such lands and waters." 36 C.F.R. § 1.2(b). The United States relies upon section 5.7, which is contained within Part 5. Yet, it has not explained how

either of the exceptions of section 1.2 apply so as to allow the regulation to reach what is, undisputedly, privately owned land within National Park System boundaries. While the United States may argue that the use of the phrase "any park areas" in section 5.7 was intended to put the regulation within the exception in section 1.2 for "regulations specifically written to be applicable on [non-federally owned] lands and waters," a review of other regulations covered by the limitation in section 1.2 shows that the Secretary of the Interior made explicit when she intended such regulations to apply on non-federally owned land. See, e.g., 36 C.F.R. § 2.3(g) ("The regulations contained in this section apply, regardless of land ownership, on all lands and waters within a park area that are under the legislative jurisdiction of the United States."). Accordingly, because the regulatory framework exempts non-federally owned land from the application of section 5.7, the regulation does not apply to the Lot and, to that extent, the United States' Motion for Summary Judgment as to this count is DENIED.

As to the Parcel, however, the United States has established ownership of the Parcel and has submitted affidavits and maps which place the Parcel within the boundaries of Minuteman National Historical Park. Doc. Nos. 100-1 at 2, 103 ¶ 13. Thus, the United States has established the applicability of the regulation to the Parcel, and, to that extent, the United States' Motion for Summary Judgment as to this count is ALLOWED.

D.    Equitable Remedies

At this time, the United States' requests for injunctive relief are DENIED WITHOUT PREJUDICE. Defendants in this case are public and quasi-public entities both of which represented to the Court, through counsel, that they will comply with any declarations issued by the Court and that the dispute, in their view, arises from a good faith disagreement over the interpretation of the law.

E.     Motion to Strike

Defendant's Motion to Strike, Doc. No. 93, is DENIED AS MOOT.  A small number of Defendant's objections were cured by subsequent filings.  The Court overrules Defendant's objections insofar as they assert a failure of the United States to comply with their disclosure obligations under Fed. R. Civ. P. 26, as no prejudice accrued against Defendant.  In all other respects, the Motion is moot in that the Court has not relied upon the portions of the affidavits Defendant asserts are not admissible.

V.     CONCLUSION

For the foregoing reasons, the United States' Motion for Summary Judgment, Doc. No. 77, is ALLOWED IN PART and DENIED IN PART.  Defendant's Motion to Strike, Doc. No. 93, is DENIED AS MOOT.  The parties shall file a joint report, as described in section IV.A supra, within ten days of the date on which this Order issued.

SO ORDERED.

  /s/ Leo T. Sorokin        
Leo T. Sorokin
United States District Judge